IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


FOREST GROVE SCHOOL DISTRICT,                          CV 04-331-MO

        Plaintiff-Appellant,                          OPINION AND ORDER

    v.

T.A.,

        Defendant-Appellee.
_____

Andrea L. Hungerford
Richard G. Cohn-Lee
The Hungerford Law Firm
615 High Street
Oregon City, Oregon   97045

      Attorneys for Plaintiff-Appellant

Mary E. Broadhurst
Mary E. Broadhurst, P.C.
P.O. Box 11377
Eugene, Oregon   97440

      Attorney for Defendant-Appellee

MOSMAN, Judge:

Plaintiff Forest Grove School District (the District) files this appeal pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400, *et seq.*, from the order of the hearing officer that the District reimburse the parents of defendant T.A. the necessary costs incurred in sending T.A. to Mount Bachelor Academy.

## FACTS[1]

T.A. has been a student in the District since kindergarten. From kindergarten through 8th grade, a number of T.A.'s teachers indicated T.A. was having difficulty paying attention in class and completing his school work. In elementary school, T.A.'s mother, and to a lesser extent, his father, assisted T.A. with his homework or school work at home.

When T.A. reached high school, T.A.'s mother helped him complete his class assignments and homework almost every day after school and sometimes on weekends. T.A.'s parents observed that he was completely disorganized and could not keep track of work done or whether he had turned in his work. T.A.'s 9th grade World Studies teacher had extensive contact with T.A.'s parents about current and future assignments. During the course of the year in World Studies, T.A. failed to turn in eleven out of thirty-four assignments and turned in five assignments late. Despite these problems, T.A. was doing better than about one-third of the students in the World Studies class in terms of missed assignments and better than average in terms of late assignments.

2001 IDEA Evaluation

In December 2000, while T.A. was a freshman, his mother contacted the school counselor concerned over the discrepancy in what teachers said he was capable of and what he was actually

---

[1] The facts as stated were found by the hearing officer and are not disputed by the parties.

doing in school. The school counselor recommended referral for an evaluation for special education services indicating difficulties in the classroom with missing assignments; not following verbal directions; talking; not following written directions; being easily distracted; having low test scores; not doing work or turning in work late; having a short attention span; and not doing much homework. District staff notes for a Multidisciplinary Team meeting on January 16, 2001 include in the discussion of the Referral, " 'Maybe ADD . . . /ADHD?' " Exhibit 1 to Amended Complaint, p. 6. The District received a medical statement for T.A. on June 8, 2001. In response to a question about health conditions affecting T.A.'s educational performance, the medical statement indicated that T.A. needed glasses.

In June 2001, T.A. was evaluated by a school psychologist to determine whether he had a learning disability. The school psychologist reviewed school records, interviewed T.A., and administered tests of cognitive ability. The school psychologist did not feel that the difficulties indicated on the Referral triggered an evaluation for Attention Deficit Hyperactivity Disorder (ADHD). A formal observation of T.A. by special education teacher Jerre Ann Pappelis in class in the spring of 2001 showed that T.A. worked quietly and independently and was appropriate. The evaluation results were considered at a meeting on June 13, 2001 at which T.A.'s mother, the school psychologist, and two other school officials were present. All four agreed that T.A. did not have a learning disability and was not eligible for special education services. Considerations discussed at the meeting were possible tutoring for T.A. in math over the summer, credit recovery or a tutorial in the fall, and reconsideration of eligibility depending on T.A.'s progress in the fall. After T.A. was found not eligible for special education in June 2001, neither his parents nor any staff member at the

high school referred him for or requested a special education evaluation while T.A. was enrolled in the high school.

Notice of Procedural Safeguards

Between December 31, 2000 and June 13, 2001, the District sent or gave T.A.'s parents at least one copy of the Notice of Procedural Safeguards which included information as to when reimbursement for private school education can be reduced or denied. The Notice gave the following advice about reimbursement for parental placements:

When Reimbursement May Be Required. A court or hearing officer may require a school district to reimburse parents for the cost of private school placement made without the consent of or referral by the school district only if:

- the child received special education and related services under the authority of a public agency before enrolling in the private school;

- the court or hearing officer finds that at that time the school district did not make a free appropriate public education available to the child in a timely manner; and

- parent provided notice removing the child from public school.

- The court or hearing officer may reduce or deny reimbursement if the parents did not inform the school district that they were rejecting the placement proposed by the school district and state their concerns and their intent to enroll their child in a private school at public expense. This notice must be given either:

  ○ at the most recent [Individualized Education Plan (IEP)] meeting that the parents attended before removing the child from public school; or
  ○ in writing to the school district at least ten business days before removing the child from public school.

Exhibit 1 to Amended Complaint, p. 10, ¶ 35.

Performance at the High School

In the five semesters that T.A. attended Forest Grove High School as a freshman, sophomore, and first semester junior, his grades ranged from As to Fs.  He received the following grades in the core classes:  Math - C, F, C, C, C; English - C, F, C, D, C; and Social Studies - C, C, D, D, B.  His final grade point average at the end of 8th grade was 2.00; at the end of 9th grade was 1.85; at the end of 10th grade was 1.64; and at the end of the first semester of 11th grade was 1.38.  He was progressing with his class from grade to grade.  The only major disciplinary infraction in T.A.'s years of attending Forest Grove High School occurred in September 2001 when T.A. was suspended when he brought a knife to school with the stated intent of self-protection after school in Portland.

In November 2001, during his sophomore year, T.A.'s parents hired his sister, who was home from college for a year,  to tutor him ten hours per week because T.A. was behind in his school work.  By the 12th week of school, T.A.'s intermediate grades had greatly improved.  Thereafter, T.A. stopped working with his sister and became disorganized.  He fell behind, and his grades went down. T.A. began using marijuana sporadically early in the winter of 2002.

In the fall of 2002, T.A. began his junior year at Forest Grove High School.  The previous summer, T.A. had acknowledged to his parents that he had been trying marijuana but that he really wanted to change things.  His first progress report in his junior year was his best in high school with four As, two Bs, and one C/D.  Other than keeping track of his assignments and making sure he was doing his homework, his parents did not provide much help with his school work.  By November 2002, T.A.'s progress report indicated that he was not turning in work and was falling behind in school.  T.A. was having angry outbursts and big mood swings at home; he dropped choir and guitar lessons; and he was using marijuana again with increasing frequency.

<u>Behavior and Substance Abuse Problems</u>

On January 27, 2003, Dr. Michael Fulop saw T.A. and his parents for an initial diagnostic interview. A new semester at school began around February 3, 2002. On February 11, 2003, T.A. ran away from home and stayed overnight at a friend's house. On February 14, 2003, T.A. was picked up by the police and returned home. He confessed to his parents that he had been using marijuana on a fairly regular basis. In the weeks before he ran away, T.A. had been very "spacey" and reclusive. On some days, he was so drugged he could not get out of bed or speak. He made over $1000 worth of telephone calls to sex talk lines and had scanned Internet pornography sites before his parents removed the computer from the home.

When he returned home on February 14, 2003, his parents brought him to see his therapist, Dr. Susan Patchin. Dr. Patchin began seeing T.A and his parents in April 2000 for problems in school and anger difficulties. Dr. Patchin had diagnosed T.A. with major depressive disorder. T.A. refused to stop using marijuana, to control his angry outbursts, or to comply with his parents' wishes. His parents took him to a hospital emergency room where he was evaluated and discharged to the care of his parents. His parents did not feel safe supervising him at home without additional support and feared he might harm himself.

On February 21 and 24, 2003, T.A. spent four hours with Dr. Fulop for evaluation and testing.

In January 2003, T.A. and his father had arranged with Gordon Garlock at the high school that T.A. would apply to the PCC Partnership Program in the hope that he could finish his high school requirements at PCC. On February 27, 2003, T.A.'s father called Sue Voigt, an assistant principal at the high school, and informed her that T.A. was undergoing medical testing, would enter

a three-week wilderness training program, and would be attending Portland Community College (PCC) in the spring. T.A. would not be returning to Forest Grove High School. On February 28, 2003, T.A.'s father informed Mr. Garlock that T.A. was enrolled at PCC, had completed his placement tests, and had met with an advisor.

On March 2, 2003, T.A. entered the Catherine Freer Wilderness Therapy Expeditions (Freer) residential treatment program. He was admitted to Freer due to substance abuse and oppositional behavior.

On March 10, 2003, T.A.'s father told Ms. Voigt, the assistant principal at the high school, that T.A. was registered at PCC as previously arranged through the high school and was officially disenrolled from Forest Grove High School. T.A.'s father never informed Ms. Voigt that he was dissatisfied with the District's placement of T.A. at PCC, and Ms. Voigt believed that T.A. was attending PCC in the Partnership Program at the beginning of the spring quarter of his junior year.

On March 12, 2003, staff at Freer informed T.A.'s parents that Freer was recommending a structured, therapeutic, out-of-home placement that would address T.A.'s depression and drug use. One day later, his parents were looking for an alternative home for T.A. in Oregon or Washington.

On March 14, 2003, Dr. Fulop met with T.A.'s parents to discuss his evaluation of T.A. and the report he was preparing. Dr. Fulop gave T.A. a diagnoses of ADHD; combined subtype;[2] and a dysthmic disorder, a form of depression with relatively long-term symptoms such as sadness, pessimism, very little motivation at times, not a lot of excitement, and often tiredness and feelings

---

[2] Under the current version of the *Diagnostic and Statistical Manual of Mental Disorders*, ADHD is the " 'main disorder' and there are three subtypes – inattentive, hyperactive, and combined. The main elements are attention problems, hyperactivity at times, motivational problems, and difficulty with executive functioning . . . ." Exhibit 1 to Amended Complaint, p. 20, n.21 (citing Transcript, pp. 272-73).

of guilt. Dr. Fulop found that T.A. had learning problems with auditory memory, auditory discrimination, expressive language, organization, and combinations of the foregoing. He identified T.A.'s academic functional limitations as reading speed; timed tests; spells poorly; confusion with number sequencing (hearing 233 instead of 332); difficulty with equations; difficulty expressing himself; very slow in speech; organization skills; incomplete work; incomplete assignments; unorganized note taking; cannot use outline; poor recall of material. Dr. Fulop gave T.A. additional diagnoses of math disorder and cannabis abuse. Dr. Fulop recommended that T.A. attend Mount Bachelor Academy (MBA) to work on his academic and therapeutic challenges. Dr. Fulop thought T.A. should be in an environment where he could work on his drug issues and school-related issues and address both his ADHD and his depression. He recommended a residential program for T.A. because of T.A.'s failure to live up to his potential in school; his difficulties at home; his attitude toward his school; his sense of hopelessness; and his drug and alcohol problem.

On March 22, 2003, T.A's parents picked T.A. up from Freer. At the time of his discharge, T.A. made a commitment to abstain from alcohol and marijuana. Freer staff questioned the sincerity of T.A.'s commitment and recommended that T.A. have 24-hour adult supervision; live in a structured environment with clear rules and expectations; and participate in an ongoing drug and alcohol, cognitive behavioral, and family therapy. The discharge report written by Freer staff identified T.A.'s primary diagnoses as cannabis dependence and his secondary diagnosis as depression NOS.

Enrollment at MBA

On March 24, 2003, T.A.'s parents enrolled T.A. by telephone in the residential program at MBA. The next day, they took T.A. to Prineville, Oregon to begin attending MBA. MBA is a

residential school which describes itself as providing a " 'well-rounded academic and emotional growth curriculum that is designed for children who may have academic, behavioral, emotional, or motivational problems.' " Exhibit 1 to Amended Complaint, p. 23, ¶ 90. Most of the 85 students at MBA have some type of learning disability, and approximately forty percent or more have ADHD. Many of the students have drug and alcohol abuse issues. Monthly tuition at MBA is $5,200.

Lisa Fairman, the learning aids coordinator at MBA, observed that T.A. " 'struggle[d] with education' – had an extremely difficult time focusing in class, being motivated to want to do well in class, sometimes to even get to the classroom." Exhibit 1 to Amended Complaint, p. 24, ¶ 94. In October 2003, Ms. Fairman identified T.A.'s greatest need, academically, as learning how to keep himself engaged in a task even if it was not something he wanted to be doing, including setting up some self-motivators to help himself get through such tasks. T.A. had a student action plan at MBA with academic, social and other goals. His first academic goal was to "develop self-management skills for ADHD to improve his academic performance and to help prepare for further education or a vocation." *Id.* at ¶ 93.

On March 28, 2003, T.A.'s father hired counsel to find out what the parents' rights were and to notify the District in writing of what T.A.'s parents were doing.

IDEA Hearing Request and Evaluation

On April 18, 2003, T.A.'s parents requested a hearing seeking an order requiring the District to evaluate T.A. in all areas of suspected disability. The District initiated the evaluation process.

In April 2003, school officials at Forest Grove High School learned that T.A. was not attending PCC in a conversation with Betty Flick, the Director of Student Services for the District.

In June 2003, Dr. Patricia Neill, a school psychologist, was engaged by the District to assist in determining whether T.A. had a disability that significantly interfered with his educational performance in the general education program. Dr. Neill reviewed Dr. Fulop's testing and evaluation, T.A.'s school records, reports from Freer, records from MBA, and a report by Dr. Patchin. Dr. Neill interviewed Forest Grove High School staff. Dr. Neill visited MBA, spoke with T.A., reviewed MBA records, and observed T.A. in class at MBA. Dr. Neill recommended a meeting be held to review the evaluation results and determine whether T.A. was eligible for special education services.

Betty Flick was the Director of Student Services for the District. She was responsible for testing and evaluation for special education services for about half of the students in the District. Ms. Flick estimated for the hearing officer that throughout the District there might be 285 to 570 students (five to ten percent of the student population) with ADHD, with 27 on 504 plans as qualified handicapped persons for ADHD, and at least 27 eligible under the IDEA as an Other Health Impairment due to ADD or ADHD. In the opinion of Ms. Flick, the difference between those who did and did not qualify for services under the IDEA or 540 plans was " 'definitely the severity of the behaviors that they demonstrate within the school setting.' " Exhibit 1 to Amended Complaint, p. 29, ¶ 113 (quoting Transcript, pp. 364-65). Ms. Flick reviewed T.A.'s grade record and concluded that his "ADHD was not having an adverse impact on his educational performance because he was not having academic difficulties 'across the board in all classes,' and had gotten Bs or Cs in some of the more challenging academic classes (for example, world studies)." *Id.* (quoting Transcript, p. 419-20). Although T.A. had received some failing grades, "he was not 'flunking out' of school, and was advancing with his class at [the high school] at the end of each semester until he

left the school." *Id.* Ms. Flick noted that many students at Forest Grove High School did not turn in their homework and related this, at least in part, to the fact that the District had a very high proportion of families who were not wealthy and students who were eligible for free and reduced lunch and/or holding down jobs as well as attending school. Ms. Flick noted that there were many students in the District for whom English was a second language, and that the number of failing grades T.A. received at the high school was not unusual. Ms. Flick noted in the fall semester of 2002, approximately 210 of the 504 freshman students in the District had the grade of F in one or more classes. In the fall of 2003, the high school had a new plan to assist students who had three or more grades of F (out of 8 classes) on a progress report.

2003 IDEA Meeting

On July 7, 2003, a Multidisciplinary Team (MDT) met to determine whether T.A. met the disability criteria in the IDEA for a learning disability, emotional disturbance, or other health impairment. The participants included T.A.'s parents; Dr. Patchin; Ms. Flick; Mr. Garlock; Shelly Reikofski, T.A.'s algebra teacher; Dr. Neill; and Ms. Pappelis. Nancy Hungerford and Mary Broadhurst, attorneys, were also present. Dr. Patchin submitted a statement indicating that health conditions that affected T.A.'s educational performance were major depressive disorder; dysthymic disorder; and ADHD, combined type. T.A.'s parents described T.A.'s struggles and behaviors and the amount of work they did throughout his school career to enable him to complete his homework and school work. One or more of the MDT members said T.A.'s school record did not show an adverse affect on his school performance since he was not completely failing school, although his grade point average had dropped significantly since middle school. When T.A.'s parents brought up incidents in T.A.'s school history that required parent visits to school and conferences with

teachers, T.A.'s depression and anxiety issues, and his daily struggles with homework, Dr. Neill and possibly one or more of the MDT members responded that the information was not in school records and should have been brought up earlier.

The MDT acknowledged that T.A.'s emotional or behavioral problems had existed over an extended period of time, but all members except T.A.'s parents and Dr. Patchin agreed that T.A. did not qualify for special education in the area of emotional disturbance or learning disability. In the area of other health impairment, the MDT concluded that T.A.'s condition, ADHD, was permanent or expected to last for more than 60 calendar days, but the majority declined to find that his disability had an adverse impact on his educational performance. When the District representatives of the MDT discussed the question of whether T.A.'s disabilities – Other Health Impairment and depression – had an adverse impact on his educational performance, they considered whether these disabilities had a "severe, significant impact" and concluded it was not severe enough. Exhibit 1 to Amended Complaint, p. 31, ¶ 124 (quoting Transcript, p. 660).

On August 26, 2003, the District conducted a Section 504 eligibility meeting for T.A. in order to determine whether he was eligible for services under Section 504 of the Rehabilitation Act as a qualified handicapped person. The MDT determined that T.A.'s diagnoses of ADHD and depression did constitute a physical or mental impairment, but that this impairment did not substantially limit T.A.'s ability to learn or care for himself, and that a Section 504 plan was not required for T.A.

Due Process Hearing

T.A.'s parents requested a due process hearing. On September 25 and 26, and October 2, 3, 17 and 22, 2003, an administrative hearing was held. Thereafter, the hearing officer issued a final order concluding that:

(1)    The District had the burden of proving that it offered T.A. a free appropriate public education (FAPE) under the IDEA, including an appropriate evaluation. The District failed to meet that burden.

(2)    T.A. is eligible for special education under the IDEA as a student with an Other Health Impairment.

(3)    T.A. is eligible for services under Section 504 of the Rehabilitation Act of 1973 as a qualified handicapped person.

(4)    The District is not responsible for reimbursing the parents for the costs of the evaluation by Dr. Fulop.

(5)    The District is not responsible for reimbursing the parents for the cost of Freer.

(6)    Until the District offers T.A. a FAPE, the District is responsible for reimbursing the parents for their necessary expenses to send T.A. to MBA.

Exhibit 1 to Amended Complaint, p. 34. The hearing officer concluded that the District's evaluation of T.A. in 2001 was inadequate as the District failed to assess T.A. for ADHD,[3] and the District failed to identify T.A. correctly in July and August 2003 as a student eligible for special education services under the IDEA. The hearing officer concluded that T.A.'s ADHD had an adverse impact

---

[3] The adequacy of the 2001 evaluation was not an appropriate subject for the 2003 due process hearing. The hearing officer found that T.A.'s mother was present at the June 13, 2001 MDT meeting and agreed with the determination that T.A. "was found not to have a learning disability and determined to be ineligible for special education." Exhibit 1 to Amended Complaint, p. 8. No further request for evaluation or special services was made by T.A.'s parents or teachers while T.A. was enrolled in the high school. *Id.* at 9.

on his educational performance, and T.A. needed special education services as a result of that disability. The hearing officer concluded:

> [T.A.] was able to progress from grade to grade in the regular curriculum in his first five semesters at [Forest Grove High School] because his parents and sister provided him with what was in effect special education at home. It is, however, the responsibility of the District and not the parents to provide a [free appropriate public education] for T.A. Therefore the District is liable for the necessary costs of T.A.'s education at Mt. Bachelor Academy – an appropriate placement – until it offers T.A. at [sic] [free appropriate public education]. . . .

> The fact that it was T.A.'s escalating drug abuse, depression and out of control behavior that caused his parents to remove him (temporarily, they anticipated) from [Forest Grove High School] and the District does not diminish the legal significance of the District's failure to offer T.A. a [free appropriate public education], or the legal right of T.A.'s parents to be reimbursed for providing him with an appropriate education at Mt. Bachelor Academy.

*Id.* at 2-3.

T.A. graduated from the emotional growth program and received a high school diploma from MBA in June 2004.

## APPLICABLE LAW

The IDEA provides federal funds to assist state and local agencies in educating children with disabilities conditioned upon compliance with certain goals and procedures. 20 U.S.C. §§ 1412, *et seq.* To receive financial assistance from the federal government under the IDEA, a State must ensure, among other requirements, that a free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21 with certain exceptions not relevant in this case. 20 U.S.C. § 1412(a)(1). Federal regulations to implement the IDEA are found at 34 C.F.R. pt. 300, and these federal regulations are mirrored in substantial part in the Oregon Administrative Rules (OAR) 581-015-0005, *et seq.* Regulations implementing Section 504 of the Rehabilitation Act of 1973, provide that a handicapped person with respect to secondary educational

services includes a person to whom a State is required to provide free appropriate public education under the IDEA. 34 C.F.R. § 104.3(1)(2)(iii).

The free appropriate public education to which a disabled child is entitled under the IDEA "does not mean the absolutely best or 'potential-maximizing' education." *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 587 (9th Cir. 1992) (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987)) (internal quotation marks omitted). The "states are obliged to provide 'a basic floor of opportunity' through a program 'individually designed to provide educational benefit to the handicapped child." *Ash*, 980 F.2d at 587 (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 201 (1982)) (internal quotation marks omitted).

Children with disabilities under the IDEA includes children who require special education because of an "Other Health Impairment" defined in OAR 581-015-0005(4) as follows:

> (h) "Other Health Impairment" means limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli that results in limited alertness with respect to the educational environment, that:
>
> (A) Is due to chronic or acute health problems (e.g. a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, attention deficit disorder, attention deficit hyperactivity disorder, leukemia, or diabetes); and
>
> (B) Adversely affects a child's educational performance.

The criteria for evaluation and for an eligibility determination for "Other Health Impairment" are provided in OAR 581-015-0051(8) as follows:

> (a) If a child is suspected of having another health impairment, the following evaluation shall be conducted:
>
> (A) A medical statement or a health assessment statement, indicating a diagnosis of a health impairment or a description of the impairment, and a statement that the child's condition is permanent or is expected to last for more than 60 calendar days;

(B)  Assessments to determine the impact of the suspected disability:

(I)  On the child's educational performance for a school-age child; or

(ii)  On the child's developmental progress for a preschool child.

(C)  Additional evaluations or assessments that are necessary to identify the child's educational needs.

(b) For a child suspected of having another health impairment, the child shall meet all of the minimum criteria:

(A)  The child exhibits limited strength, vitality or alertness, including a heightened alertness to environmental stimuli that results in limited alertness with respect to the educational environment;

(B)  The child's limited strength, vitality or alertness is due to a chronic or acute health problem; and

(C)  The child's condition is permanent or expected to last for more than 60 calendar days.

(c)  For a child to be eligible for special education services as a child with another health impairment, the eligibility team shall determine that:

(A)  The child's disability has an adverse impact on the child's educational performance; and

(B)  The child needs special education services as a result of the disability.

If a parent is dissatisfied with the determination of a school district concerning the identification, evaluation, or educational placement of a child, the parent may request a due process hearing.  20 U.S.C. § 1415(f) and O.R.S. 343.165(1)(a).  Oregon law provides for such a hearing before an independent hearing officer appointed by the Superintendent of Public Instruction.  O.R.S. 343.165(8).  Any party aggrieved by the hearing officer's decision may seek further review in state or federal court.  20 U.S.C. § 1415(i)(2)(A) and O.R.S. 343.175(2).

Upon review, the court is required to receive the records of the administrative proceedings, hear additional evidence at the request of a party, and base its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B).[4] The court must consider the administrative findings, but it is within the court's discretion to "reject the findings in part or in whole." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1474 (9th Cir. 1993). The amount of deference that the court accords the hearing officer's findings increases where they are " 'thorough and careful.' " *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). Upon review, the party challenging the administrative ruling has the burden of proof. *Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396, 1399 (9th Cir. 1994).

## CONTENTIONS OF THE PARTIES

The District contends that 1) tuition reimbursement should be denied because T.A.'s parents unilaterally removed him from public school to a private placement without requesting special education services or providing any notice of their desire that the District pay for private placement; 2) the hearing officer erred in finding T.A. eligible for special education services under the IDEA; and 3) the hearing officer erred as a matter of law by making the District responsible for T.A.'s drug abuse treatment.

T.A. contends that 1) the hearing officer correctly determined that the notice provision of the IDEA does not apply because he had not previously received special education and his parents have an equitable right to reimbursement; 2) the hearing officer correctly found that T.A. qualified for services under the IDEA; and 3) the hearing officer correctly found that T.A.'s drug use did not make him ineligible for services under the IDEA.

---

[4] The parties in this case have not submitted additional evidence or requested a further hearing.

<u>**ANALYSIS**</u>

This court accepts the facts as found by the hearing officer and has given the legal conclusions of the hearing officer substantial deference. However, this court exercises its independent judgment based upon a preponderance of the evidence as to whether the legal conclusions reached by the hearing officer are supported by the facts. *See Capistrano Unified Sch. Dist.*, 59 F.3d at 892.

<u>Eligibility for Tuition Reimbursement Pursuant to 20 U.S.C. § 1412(a)(10)(C)</u>

In *School Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 369 (1985), the United States Supreme Court held that the IDEA's grant of equitable authority under 20 U.S.C. §1415(e)(2) empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." The 1997 amendments to the IDEA subsequently addressed the circumstances under which tuition reimbursement may be available, including a section entitled "Payment for education of children enrolled in private schools without consent of or referral by the public agency," 20 U.S.C. § 1412(a)(10)(C). This section begins by stating that the IDEA does not "require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i). This provision states:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the

parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii).  The court may reduce or deny the cost of reimbursement if the parents did not inform the District at the most recent IEP of their intent to enroll their child in private school at public expense or give written notice to the District ten business days prior to removal and private placement.  20 U.S.C. § 1412(a)(10)(C)(iii)(I).  The statute provides specific exceptions to this notice requirement; for example, if the parent is illiterate and cannot write in English, if compliance with notice would likely result in physical or serious emotional harm to the child, or if the parents have not received notice of the notice requirement.  20 U.S.C. § 1412(a)(10)(C)(iv).

In *Greenland Sch. Dist. v. Amy N.,* 358 F.3d 150 (1st Cir. 2004), the parents of a student who had not received special education services argued that the prior notice provision of the IDEA did not apply when the student had not previously received special education in the public school system.  The parents in *Greenland* unilaterally removed their daughter, diagnosed with ADHD, from public school at the end of the 4th grade and placed her in private school without raising the issue of special education services.  After almost a year, the parents sought tuition reimbursement.  The circuit court denied tuition reimbursement, noting that "there was no notice at all to the school system before Katie's removal from Greenland that there was any issue about whether Katie was in need of special education."  *Id.* at 160.  The circuit court reviewed the 1997 amendments to the IDEA and concluded:

These statutory provisions make clear Congress's intent that *before* parents place their child in private school, they must at least give notice to the school that special education is at issue.  This serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools.

*Id.* at 160. The circuit court concluded that "a child like Katie who is removed from her school without her parents or her school ever questioning the availability of FAPE is not within the category of children eligible for tuition reimbursement." *Id.* at 161.

Even for children who previously received special education services in the public school, the statute imposes limitations upon reimbursement for private placement without the consent or referral of the public agency. The cost of reimbursement may be reduced or denied if the parents do not give the school district notice of their intent to remove their child from public school before they do so "at the most recent IEP meeting that the parents attended prior to removal of the child from the public school" or by written notice ten business days prior to removal. 20 U.S.C. § 1412(a)(10)(C)(iii)(I). The requirement of notice before unilateral withdrawal and private placement is important to advance "[t]he IDEA's preference for a cooperative placement process." *Patricia P. v. Board of Educ. of Oak Park*, 203 F.3d 462, 468 (7th Cir. 2000) ("parents who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placement").

In the case before this court, the District contends that T.A.'s parents were required by the IDEA to provide the District with notice that special education was at issue before they unilaterally placed T.A. in a private school and sought public funding for that placement. The District explains that T.A.'s parents failed to notify the District that T.A. needed evaluation or that T.A. needed special education services. TA contends that the hearing officer correctly concluded that any notice requirement in the IDEA applies only when a student had previously received special education services and did not apply in this case because T.A. had never received special education services.

The statutory language in section 1412(a)(10)(C)(ii) provides that "the parents of a child with a disability, who previously received special education and related services under the authority of a public agency" may receive tuition reimbursement for unilateral placement in a private school subject to the limitations in section 1412(a)(10)(C)(iii). Section 1412(a)(10)(C)(ii) cannot be read to authorize tuition reimbursement for a child enrolled in private school without the consent of or referral by the public agency, even though he was not "previously receiving special education" but exclude the child from the limitations on reimbursement contained in section 1412(a)(10)(C)(iii). In fact, T.A.'s argument turns the statutory language on its head. The plainest reading of the statute is that *only* children who had previously received special education services from the District are even eligible for such tuition reimbursement. The plain reading of the statute, in other words, makes T. A entirely ineligible for reimbursement.

In any event, allowing tuition reimbursement under section 1412(a)(10)(C)(ii) for parents who did not request evaluation for special education services prior to deciding to withdraw their child from public school and seek reimbursement for private school runs contrary to the statutory language and the intent of Congress that parents and school authorities work cooperatively.

There is no dispute in this case that T.A.'s parents did not request evaluation or services subsequent to his evaluation in June 2001 and prior to his withdrawal from Forest Grove High School for drug treatment in April 2003. There was no notice to the school system prior to T.A.'s removal from Forest Grove High School in 2003 that T.A.'s parents felt that T.A. was in need of special education. The District had no opportunity to address special education issues within the public school setting. T.A. was initially evaluated for special education services during his freshman year and found to be not eligible. T.A.'s mother agreed with this conclusion, and the hearing officer

found that the Notice of Procedural Safeguards provided to T.A.'s parents informed them, in part, that:

> A court or hearing officer may require a school district to reimburse parents for the cost of private school placement made without the consent or of referral by the school district only if:
>
> • the child received special education and related services under the authority of a public agency before enrolling in the private school;
>
> • the court or hearing officer finds that at that time the school district did not make a free appropriate public education available to the child in a timely manner; and
>
> • parent provided notice removing the child from public school.

Exhibit 1 to Amended Complaint, p. 10, ¶ 35.

T.A. struggled academically and began using marijuana in his sophomore year. Neither T.A.'s parents nor his teachers raised any further issue of special education services through his sophomore year and his junior year prior to his enrollment in private school. At the start of the second semester of his junior year, T.A.'s parents took him to Dr. Fulop for an evaluation. The hearing officer found that T.A.'s parents "had the option of asking that the District pay for Dr. Fulop's evaluation of T.A. and if the District refused, the District would have had to initiate a due process hearing to show that its evaluation was appropriate. Instead the parents arranged for the evaluation by Dr. Fulop without informing the District that it was taking place." *Id.* at 41. Shortly thereafter, T.A.'s parents unilaterally removed him from school and placed him in a drug treatment program at Freer. The hearing officer found that "T.A. was sent to Freer due to substance abuse and oppositional behavior, after he binged on marijuana and ran away from home for several days." *Id.* at 44. Because "the placement at Freer was not appropriate to meet his educational needs," the hearing officer found that T.A.'s parents were "not entitled to reimbursement for that placement."

*Id.* The hearing officer found that Dr. Fulop and the staff at Freer recommended residential placement for T.A. based upon his drug use issues. In order to meet his educational needs, T.A., his parents, and the officials at Forest Grove High School had arranged in January 2003 for his placement in the PCC Partnership Program. T.A.'s private residential placement was a result of his drug use. T.A.'s parents did not inform the District that special education services were at issue prior to T.A.'s parents withdrawing him from public school and enrolling him in private school. This court concludes that the requirement of section 1412(a)(10)(C)(ii) that the student "previously received special education and related services" prior to unilateral removal and private placement in order to receive tuition reimbursement were not met because T.A.'s parents agreed with an evaluation two years earlier that T.A. was not eligible; T.A.'s parents had not requested any further evaluation or special services prior to removal from school; and T.A. was removed from school for reasons not related to special education services. T.A. is not within the category of children eligible for tuition reimbursement under section 1412(a)(10)(C). Furthermore, even if T.A. were eligible for tuition reimbursement, T.A.'s parents did not provide any notice to the District prior to unilateral private placement as they were required to do.

Eligibility for Tuition Reimbursement Under the General Principles of Equity

T.A. contends that the hearing officer had the discretion to award reimbursement under the general principles of equity, even if the tuition reimbursement is not authorized under section 1412(a)(10)(C). T.A. contends that the District had ample information about his struggles in school, and that the District was informed that his parents were seeking tuition reimbursement within a month of his withdrawal from school. T.A. contends that the court should excuse the failure to request special education services or to provide notice of unilateral placement in private school

because the District found him not eligible for special education services after his placement in private school.

The District contends that T.A.'s parents were informed of the IDEA procedures, unilaterally removed T.A. from public school and placed him in private school to address his drug problems without seeking special education services, and later sought public funding for their unilateral placement. The District contends that T.A.'s educational performance was not notably different from other Forest Grove High School students with average intellectual ability, and that T.A.'s parents were familiar with their rights under the IDEA and removed T.A. from public school for residential drug treatment.

In *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993), the United States Supreme Court stated:

> [W]e note that once a court holds that the public placement violated IDEA, it is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Under this provision, "equitable considerations are relevant in fashioning relief," *Burlington,* 471 U.S., at 374, 105 S.Ct., at 2005, and the court enjoys "broad discretion" in so doing, *id.*, at 369, 105 S.Ct., at 2002.

*Florence* and *Burlington* involved students who were receiving special education services. The parents dissatisfied with the adequacy of the services challenged the Individual Education Plan (IEP) and later withdrew their child from public school and enrolled the child in private school without the consent of the school authorities. In addressing the unilateral action of the parents, the Court noted that the course of administrative and judicial review leave the parents faced with the difficult choice: "go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." *Florence,* 510 U.S. at 365 (quoting *Burlington*, 471 U.S. at 370).

Section 1412(a)(10)(C) was enacted subsequent to *Florence* and *Burlington* providing tuition reimbursement for a student who previously received special education services placed in private school without the consent of school authorities. Even assuming that tuition reimbursement may be ordered in an extreme case for a student not receiving special education services, under general principles of equity where the need for special education was obvious to school authorities and the parents were uninformed or unable to request services, the facts in this case do not support such an exercise of equity. *See Greenland*, 358 F.3d at 160 n.8.

First, this is not a case where the school failed to inform parents of their rights and obligations under the IDEA. In fact, the parents acknowledge receipt of the Notice of Procedural Safeguards, which included their obligation to provide notice.

Second, this is not a case where it was obvious to the school that T.A. needed special education services.

T.A. maintained a C minus average, failing on average one class per semester. The Director of Student Services for the District testified that in the first semester of the 2002-2003 school year, 210 of the 504 freshman students in the District earned an F in one or more classes. Exhibit 1 to Amended Complaint, p. 29, ¶ 115 (citing Testimony of Betty Flick, Tr. 366). In the fall semester of his junior year, T.A. passed all of his core classes receiving a C in Algebra, a C in English, and a B in American History. School District Exhibits, Exhibit B11.

T.A.'s high school teachers testified at the hearing that T.A. was attentive in class, did his work, and was not a behavior problem or a distraction. For example, Tr. 187 - "no behavioral problems;" Tr. 186 - "was pretty well on task;" Tr. 483 - "[h]e would come in, he would start his journal entry and he would be . . . be with it;" and Tr. 1320 - "My experience with TA was good.

He was a pretty good student. He was attentive for the most part, he attended regularly. He did a fine job." T.A.'s freshman World Studies teacher testified that despite missing and late assignments, T.A. earned a C in both semesters and "was doing better than I would say probably one third of my students." Tr. 1334. T.A.'s classroom behavior and attendance were consistently appropriate with one disciplinary incident and some tardies.

The need for special education services was not so obvious in this case that the general exercise of equity would override the statutory requirement for tuition reimbursement. T.A.'s academic performance was not unlike many students at Forest Grove High School. T.A.'s parents withdrew him from public school and enrolled him in a private residential school in order to address his drug use. T.A.'s parents were informed of their rights under the IDEA and were able to request special education services prior to their unilateral decision to withdraw T.A. from public school. Equitable considerations would not support tuition reimbursement in this case.

## CONCLUSION

IT IS HEREBY ORDERED that the conclusion of the hearing officer that the District is liable for the costs incurred in sending T.A. to Mt. Bachelor Academy is REVERSED. The court will enter judgment in favor of the District and against T.A.

DATED this 11th day of May, 2005.

/s/ Michael  W. Mosman
MICHAEL W. MOSMAN
United States District Judge