IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FOREST GROVE SCHOOL DISTRICT,

        Plaintiff-Appellee,

        v.

T.A.,

        Defendant-Appellant.

No. CV 04-331-MO

OPINION AND ORDER

**MOSMAN, J.,**

    Plaintiff-Appellee Forest Grove School District ("District") brought this suit seeking to reverse the ruling of the hearing officer that the District was liable for the costs incurred in sending T.A. to Mt. Bachelor Academy ("MBA") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Upon initial consideration, this Court ordered that the decision of the hearing officer be reversed because 20 U.S.C. § 1412(a)(10)(C) limited the right to reimbursement under the IDEA, (Op. & Order (#26) 18-21), and T.A. was ineligible to receive reimbursement under general principles of equity because this was not an "extreme" case where the "need for special education was obvious to school authorities and the parents were uninformed or unable to request services," (*Id.* at 25 (citing *Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 n.8 (1st Cir. 2004))).

    The Ninth Circuit reversed and remanded because § 1412(a)(10)(C) does not apply to students who have never received special education and I improperly considered the standards of

PAGE 1 - OPINION AND ORDER

§ 1412(a)(10)(C) and applied the wrong legal standard in determining whether reimbursement was proper under general principles of equity pursuant to § 1415(i)(2)(C). *Forest Grove Sch. Dist. v. T.A. (Forest Grove II)*, 523 F.3d 1078, 1087-88 (9th Cir. 2008). The United States Supreme Court agreed, holding that § 1412(a)(10)(C) does not provide a categorical bar to reimbursement for students who have not "previously received special education and related services under the authority of a public agency." *Forest Grove Sch. Dist. v. T.A. (Forest Grove III)*, 129 S. Ct. 2484, 2488 (2009) (quoting 20 U.S.C. § 1412(a)(10)(C)(ii)).

> When a court or hearing officer concludes that a school district failed to provide a [free and appropriate public education] and the private placement was suitable, it must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted.

*Id.* at 2496.

On remand, I hold that the equities do not support reimbursement in this case and therefore REVERSE the decision of the hearing officer.

## BACKGROUND

There is no need to include a recitation of the facts because this Court laid out the facts of this case in great detail in the previous Opinion and Order. (*See* Op. & Order (#26) 2-14.) Both the Ninth Circuit and the Supreme Court have also examined the facts extensively. *See Forest Grove III*, 129 S. Ct. at 2488-89; *Forest Grove II*, 523 F.3d at 1081-83. Facts relevant to the weighing of the equities will be cited as needed below.

//

//

**STANDARD OF REVIEW**

T.A. argues that I must defer to the decision of the hearing officer unless she abused her discretion. However, the Ninth Circuit has clearly stated that such deference to the hearing officer is improper in cases brought under the IDEA. *See Forest Grove II*, 523 F.3d at 1084-85 (stating "no case supports T.A.'s contention that we review *the hearing officer's decision* for abuse of discretion"). "The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply." *Ash v. Lake Oswego Sch. Dist., No. 7J (Ash II)*, 980 F.2d 585, 587 (9th Cir. 1992). The district court "must consider the findings carefully . . . [but a]fter such consideration, the court is free to accept or reject the findings in part or in whole." *Id.* at 587-88.

As in my previous Opinion and Order, I accept the facts as found by the hearing officer and give the legal conclusions of the hearing officer substantial deference. However, I exercise my independent judgment based on a preponderance of the evidence as to whether the legal conclusions reached by the hearing officer are supported by the facts. *See Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

**DISCUSSION**

The IDEA provides that a district court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). A district court must use general principles of equity and "consider all relevant factors in determining whether to grant reimbursement and the amount of reimbursement" pursuant to § 1415(i)(2)(C). *Forest Grove II*, 523 F.3d at 1088-89; *see also Forest Grove III*, 129 S. Ct. at 2496 (a court "must consider all relevant factors"). "[N]otice to

PAGE 3 - OPINION AND ORDER

the school district is a relevant equitable consideration." *Forest Grove II*, 523 F.3d at 1089 (citing *Ash v. Lake Oswego Sch. Dist. No. 7J (Ash I)*, 766 F. Supp. 852, 853-55, 864 (D. Or. 1991); *Ash II*, 980 F.2d at 586); *see also Forest Grove III*, 129 S. Ct. at 2496. Other "[f]actors to be considered [by the district court] include[] the existence of other, more suitable placements, the effort expended by the parent[s] in securing alternative placements[,] and the general cooperative or uncooperative position of the school district." *Forest Grove II*, 523 F.3d at 1089 (quoting *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1487 (9th Cir. 1992)). The Ninth Circuit further noted that, in this case, the hearing officer's determination that T.A. was sent to MBA "also for reasons unrelated to his disabilities (i.e., substance abuse and behavioral problems)" is a relevant factor to the determination of whether reimbursement is proper. *Id.*

It is undisputed that notice was not provided to the District regarding T.A.'s move to MBA until well after the school change was completed on March 24, 2003. (Op. & Order (#26) 9.) T.A.'s parents requested a hearing seeking an order requiring the District to evaluate T.A. in all areas of suspected disability on April 18, 2003. (*Id.*) In July, a multidisciplinary team ("MDT") met and determined that T.A. did not qualify for special education under the IDEA. (*Id.* at 11-12.) On August 26, 2003, the MDT further determined that T.A.'s impairments did not substantially limit his ability to learn or care for himself, indicating that a Section 504 plan was not required. (*Id.* at 12.) Thus, the District and T.A.'s parents did not disagree about T.A.'s placement until after the MDT made its determinations and T.A. is not entitled to reimbursement for tuition paid to MBA from March 24, 2003, to August 26, 2003. *See Ash I*, 766 F. Supp. at 864 (holding that a right to reimbursement did not arise until the school district

was asked to provide services, completed an evaluation process, and failed to provide a free appropriate public education).

General principles of equity weigh against the payment of tuition reimbursement for the period following August 26, 2003, as well. The record does not indicate whether other, more suitable placements existed for T.A. However, T.A.'s parents had arranged with the District for T.A. to attend Portland Community College ("PCC") in the Partnership Program, and the record contains is no explanation as to why this was or was not a suitable placement. (*See* Op. & Order (#26) 6-7.) This factor is unhelpful due to the lack of concrete information in the record.

T.A.'s parents do not appear to have expended significant effort to secure T.A.'s place at MBA. In fact, T.A. was enrolled at MBA ten days after Dr. Fulop recommended the school. (*Id.* at 7-8.) T.A.'s parents do not appear to have done significant research into schools specializing in dealing with children with ADHD and depression to determine the best placement for T.A. Instead they chose the first school mentioned by Dr. Fulop and enrolled T.A. without even visiting MBA. (*See id.* at 8.) This factor weighs against requiring the District to reimburse T.A. for the cost of MBA, particularly in light of the evidence that T.A.'s parents enrolled him at MBA for reasons other than his ADHD and depression.

The District has been cooperative in evaluating T.A. for disabilities in 2001 and again in 2003 and arranging for T.A. to apply for the PCC Partnership Program upon the request of T.A.'s father. However, during the 2001 evaluation, notations were made regarding the possibility that T.A. suffered from Attention-Deficit/Hyperactivity Disorder ("ADHD"). *See Forest Grove II*, 523 F.3d at 1081 (explaining that notes from a January 16, 2001, meeting state "Maybe ADD/ADHD?" and notes from a February 13, 2001, meeting mention "suspected

ADHD"). Despite these notations, no evaluation was ordered under the "other health impairment" prong of the IDEA. The District's own expert witness testified that she would have further evaluated T.A. in 2001 for an "other health impairment" based on the notations of ADHD in the record. *Id.* at 1082. Failing to follow up on relevant and possibly dispositive notation in the record, despite further investigation being the regular practice of the District in such situations, is evidence that the District was uncooperative during the evaluation process. Therefore, I find that this element weighs in favor of T.A.

The decisive factor in this case is that T.A.'s parents appear to have enrolled T.A. in MBA not because of any disability recognized by the IDEA but because of his drug abuse and behavioral problems. The timing of the change in schools is instructive here: T.A.'s parents decided to send T.A. to MBA after he admitted to using marijuana on a fairly regular basis, was occasionally so drugged that he could not get out of bed or speak, made over $1,000 worth of telephone calls to sex talk lines, scanned Internet pornography sites, and ran away from home. (*Id.* at 6.) T.A.'s father, when enrolling him at MBA, indicated on the application that the "enrollment was precipitated by 'inappropriate behavior, depression, opposition, drug use, runaway.'" (ALJ's Final Order Findings of Fact ¶ 89.) Significantly, ADHD and trouble with school work were not among the reasons listed.

At oral argument, counsel for T.A. argued that the inappropriate and oppositional behavior and drug use could be symptoms of T.A.'s ADHD and that by listing them on the application, T.A.'s father was enrolling T.A. in MBA as a result of his ADHD. That may be true and I make no findings regarding the possible or probable symptoms of ADHD. However, it is important to note that the District's responsibility under the IDEA is to remedy the learning

PAGE 6 - OPINION AND ORDER

related symptoms of a disability, not to treat the underlying disability, or to treat other, non-learning related symptoms. The District certainly cannot begin treating a student's underlying medical disability, whether it be ADHD or some other mental or physical disability. That responsibility rests with the parents and medical professionals. Counsel for T.A. acknowledged at oral argument that the District would not be responsible for the cost of MBA if T.A.'s ADHD symptoms were limited to behavior problems and drug use. Here, T.A.'s father said nothing on the MBA application about the one ADHD symptom for which the District could be liable, T.A.'s trouble with his school work. The equities do not favor requiring the District to reimburse T.A.'s parents for a decision to send T.A. to a school because of his drug abuse and behavioral problems that are unrelated to his difficulties focusing in school.

    I believe it is important to note as well that T.A.'s parents chose an extraordinarily expensive option among all the possible choices. MBA charges its students $5,200 a month. At the 2003 hearing, the Director of Student Services for the District indicated that approximately 285 to 570 students in the District suffered from ADHD (five to ten percent of the student population). (Op. & Order (#26) 10.) Providing $5,200 a month to each of these students would cost $1,428,000 to $2,964,000 a month, or $12,852,000 to $26,676,000 a year, assuming a nine month school year. The total expenditures for the District, per year, are approximately $65,000,000. Forest Grove Sch. Dist. Audit 2006-07 & 2007-08, http://www.fgsd.k12.or.us/ (follow "Budget" hyperlink under "About Us"; then follow "Audit" hyperlink). Thus, the District would be forced to pay twenty to forty percent of its average annual expenditures on

five to ten percent of its students.[1]  Of course, the IDEA makes no provision for taking into account the proportional impact of this unfunded federal program.  Nor did the Ninth Circuit or the Supreme Court indicate that I should take this into account in my analysis and I have not done so.  I include this information merely to demonstrate that decisions, such as the one in this case, can have potentially devastating real world implications.

## CONCLUSION

For the foregoing reasons, the conclusion of the hearing officer that the District is liable for the costs incurred in sending T.A. to Mt. Bachelor Academy is REVERSED and judgment is entered in favor of the District.

IT IS SO ORDERED.

DATED this  8th  day of December, 2009.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

---

[1] Even if payment was only required for the fifty-eight students the District already found eligible under the IDEA or Section 504 (which did not include T.A.), it would still be required to pay $2,714,400 a year to send those students to MBA, or its equivalent.  This is the equivalent of spending four percent of the annual expenditures on one percent of the student population.

PAGE 8 - OPINION AND ORDER